## PERKINS et al. v. LAWRENCE SPERRY AIRCRAFT CO., Inc.

No. 4082.

District Court, E. D. New York.

April 6, 1932.

Claude C. Ross, of New York City (Frank E. Liverance, Jr., of Grand Rapids, Mich., of counsel), for plaintiffs.

Herbert H. Thompson, of Brooklyn, N. Y. (Howard L. Godfrey, of Washington, D. C., of counsel), for defendant.

GALSTON, District Judge.

This is a suit brought under and in accordance with the provisions of Revised Statutes 4915 (U. S. C. title 35, § 63 [35 USCA § 63]).

Perkins, one of the plaintiffs, on August 14, 1922, filed an application for letters patent in the United States Patent Office for an improvement for an aircraft carrier. On August 13, 1925, an interference was declared between that application and an application for letters patent which had been filed by Lawrence B. Sperry on June 27, 1922, for a device for launching and landing airplanes from and upon suspended positions.

The subject-matter upon which the interference was declared was defined in the following four counts:

"Count 1. In combination with a relatively large aircraft, a trapeze construction suspended therefrom and extending below the same, and means associated with said construction tending to maintain it vertical with reference to the aircraft, while the said craft is in flight for automatic engagement by another aircraft, substantially as described.

"Count 2. In combination with a relatively large aircraft, of a trapeze construction suspended therefrom, and means for elevating said construction to and housing it within the sides of said aircraft, substantially as described.

"Count 3. In combination with a relatively large aircraft, having a cabin related thereto, of a trapeze construction adapted to be suspended below said cabin, including depending members and bar connection between the lower ends thereof and means for elevating said trapeze construction to a stream line position relative to said cabin.

"Count 4. In combination with a relatively large aircraft, having a cabin related thereto, of a trapeze construction adapted to be suspended below said cabin, including depending members and bar connections between the lower ends thereof and means for elevating said trapeze bar structure within the enclosure of the cabin."

On October 27, 1927, priority of invention was awarded to Sperry by the Examiner of Interferences. Subsequently the Board of Appeals of the United States Patent Office affirmed the decision of the Examiner of Interferences. A motion for rehearing was denied, as was a petition to the Commissioner of Patents to dissolve the interference on the ground that Sperry had no right on his disclosure to any of the claims of the counts in issue.

Thereafter the claims of the Perkins' application, identical with the counts of the interference, were finally rejected by the Commissioner of Patents.

The complaint further recites that Sperry was not the first inventor of the construction defined in counts 2, 3, and 4; that he had never invented such construction therein described; and that Perkins was the first and only inventor thereof, as well as of the construction defined in count 1.

Accordingly, the plaintiffs now seek a decree which will enable them to obtain from the Commissioner of Patents a patent for the invention as described in the counts of the interference.

A suit brought under the act in question is an original independent action triable de novo on all competent evidence, new and old. Harper v. Zimmermann (D. C.) 41 F.(2d) 261; Greene v. Beidler (D. C.) 47 F.(2d) 927.

In the interference contest the successful party, Lawrence B. Sperry, adduced no testimony, relying wholly on the inadequacy of the showing made by Perkins. At the trial of this cause, however, the defendant did adduce testimony in support of Sperry's priority. The defendant is, of course, not bound by the rule stated in Barrett Co. et al. v. Koppers Co. et al. (C. C. A.) 22 F.(2d) 395, 397, wherein it is stated: "The law gave the plaintiffs a day in court on the issue of priority. That was the day the interference was heard and if they chose not to avail themselves of their full rights but to gamble on the decision by giving only a part, and the weaker part, of the evidence they had in hand, they did it at their own risk. After losing on such evidence in what otherwise would be a train of futile appeals in the patent tribunals and Court of Appeals of the District of Columbia they cannot come into a District Court and say, now for the first time we shall tell the true story of reduction to practice and demand a patent."

But the plaintiff, the losing party, is bound by that rule; and accordingly I shall attach no weight to such testimony and proffered exhibits as were available to Perkins, but not offered by him in the interference proceeding.

Among the exhibits thus excluded are: An abandoned application filed by Perkins July 16, 1917, serial No. 180,787, only provisionally received in evidence, during the course of the trial pending a consideration of the record in the interference proceedings and a reading of the many depositions taken herein, as Perkins' Exhibit No. 1; an aban-

doned application of Perkins, serial No. 192,101, filed September 19, 1917, also provisionally received as Exhibit No. 2; also Exhibit No. 4 containing the application which resulted in letters patent No. 1,738,261. Decision was reserved on the admission of Plaintiffs' Exhibit No. 6 consisting of three blueprints. The tracings are not produced nor the original drawings, nor is their loss accounted for. The checks that were offered in evidence, evidencing some payment to a draftsman, are unconnected with proof that the checks covered the work done for the making of the drawings or tracings. The objection to the admission of the exhibit is therefore sustained.

With the exclusion of the foregoing exhibits, there should also be considered Plaintiffs' Exhibit No. 7 which was offered in the interference proceeding. Even were the proofs as to these sheets satisfactory, it appears the drawings themselves are inadequate, for they do not disclose the structure defined by any of the four counts of the interference.

As to new evidence presented in the trial herein, plaintiffs offered, besides the exhibits heretofore referred to, the testimony of Perkins, Frank E. Liverance, Jr., his attorney, and that of Mr. Liverance's partner, Van Antwerp. The testimony of all three was certainly available at the time of the interference proceeding, and should have been given in that proceeding. It is true that part of it relates to the question of inoperativeness of the Sperry device under count 1, and insufficient disclosure as to counts 2, 3, and 4; but on the question of priority there is no reason why this court should now consider any of such testimony, since no sufficient reason appears why it was not taken during the interference proceeding.

On the issue of priority, that leaves the matter squarely then on the record made by Perkins in the interference proceeding. As I read that record, he failed to establish a date of conception prior to the date of the rejected blueprints bearing the alleged date September 20, 1921. Following the making of these rejected blueprints, he said that he made no personal effort to invest money in developing the landing of a small aircraft on a larger aircraft by a suspended trapeze perch. In 1923 he did carry on some correspondence with Sperry or his company, but there is a letter of March 25, 1922, addressed to the Goodyear Tire & Rubber Company, setting forth a general description of the device in question, and indicates a conception by Perkins as of that date, through the medium of the Goodyear Tire & Rubber Company, to secure a reduction to practice. Unfortunately, the five sheets of drawings referred to in this letter are not produced, and there is no proof that the five sheets offered (Plaintiffs' Exhibit No. 9) are similar to those five sheets. But assuming that the drawings are sufficiently proved as similar to those referred to in the letter to the Goodyear Company, then we have a conception dated back at least to the time of the letter.

Following this, however, there is no proof of diligence to the time of the filing of his application for letters patent on August 14, 1922.

Sperry, on the other hand, filed his application on June 27, 1922, and the proofs in respect to his conception may be carried back to the summer of 1920. At that time he made a disclosure and gave instructions for drawings to Rudolph Funk, a designing engineer in his employ at the time. Prior thereto Sperry had had a talk also with General Mitchell in respect to the proposed device, as is indicated in the letter of General Mitchell to the chief of the Air Service dated October 17, 1921. General Mitchell testified: "Upon my return from the war in April, 1919, we took up the problem of carrying airplanes on airships. In this connection Lawrence Sperry proposed to make landing devices by which an airplane could fly under an airship, hook onto a trapeze, and either remain in position or be hoisted up into the body of the airship or other airplane."

Sperry also discussed his invention with the witness Moyer in November, 1921; and Moyer testified that the Bolgiano sketch of the Sperry device dated January 21, 1922, discloses in general the structure referred to by Sperry in his talk with Moyer. It may be noted that this Bolgiano sketch discloses the same structure as is disclosed in the Funk sketch.

Therefore, as between Sperry and Perkins, Sperry was the first to conceive; and his diligence is amply proved by the progress which he made with the War Department from October, 1921, continuing to the time of the filing of his application for letters patent on June 27, 1922, and thereafter to actual reduction to practice.

There remains for consideration an exceedingly interesting question raised by the plaintiffs. They assert that Perkins was foreclosed from raising the question of inoperativeness and inadequate disclosure of the Sperry device under the counts in ques-

tion, because of his failure to comply with the provisions of rule 130 of the Patent Office, which rule reads as follows: "Where the patentability of a claim to an opponent is material to the right of a party to a patent, said party may urge the nonpatentability of the claim to his opponent as a basis for the decision upon priority of invention. A party shall not be entitled to raise this question, however, unless he has duly presented and prosecuted a motion under Rule 122 for dissolution upon this ground or shows good reason why such a motion was not presented and prosecuted. When the Examiner of Interferences has denied such a motion for dissolution the question shall not be reinvestigated by him except in view of evidence which was not before him when the motion was considered, but it may be raised before the appellate tribunals on appeal from the award of priority."

He now seeks in this suit to raise the same question. The defendant replies that there is a sufficiency of disclosure and that the Sperry device is operative; but in addition contends that, in a suit such as this, only the question of priority may be considered, citing Standard Cartridge Co. et al. v. Peters Cartridge Co. (C. C.) 69 F. 408, 410. In that case it was held:

"That attack cannot properly be made in this case, which is under section 4915, and not under section 4918, of the Revised Statutes, and is a continuation of the interference contest in the patent office. The only question that can be considered here is whether the complainant * * * is entitled, according to law, to receive a patent for the invention described in the bill, and as specified in his claim filed in the patent office.

"Whether the specification in the patent issued to the defendant is sufficient or insufficient is not involved in this case. It is wholly incompetent, and cannot be inquired into. Pentlarge v. Pentlarge [C. C.] 19 F. 817; Lockwood v. Cleveland [C. C.] 20 F. 164; American Clay-Bird Co. v. Ligowski Clay-Pigeon Co. [C. C.] 31 F. 467."

The case was affirmed on appeal, reported in (C. C. A.) 77 F. 630, but apparently the question was not discussed in the affirmance.

In principle I cannot see why a suit based on the provisions of section 4915 of the Revised Statutes (U. S. Code, title 35, § 63 [35 USCA § 63]) should be limited to a determination of the issue of priority. Certainly, if a patent on its face appears to be invalid as to those claims founded on the interference counts, and if, on the contrary, plaintiff (the losing party in the interference) does disclose in his application an invention supporting the counts on the interference, then obviously such plaintiff, being the only one to conceive and reduce to practice, is entitled to a patent. The relevant provisions of section 4915 (U. S. Code, title 35, § 63 [35 USCA § 63]) are: "§ 63. Bill in equity to obtain patent. Whenever a patent on application is refused, * * * the applicant may have remedy by bill in equity; and the court having cognizance thereof, on notice to adverse parties and other due proceedings had, may adjudge that such applicant is entitled, according to law, to receive a patent for his invention, as specified in his claim, or for any part thereof, as the facts in the case may appear."

There is nothing explicitly in the statute which limits the issue to one of priority; and the complaint in this case was not so limited. Judge Westenhaver, in Melling v. Gordon Form Lathe Co. (D. C.) 14 F. (2d) 437, in an action brought under this section of the statute, examined the defendant's patent to determine whether the drawings and specifications supported the claims, and in his opinion refers to Hill v. Wooster, 132 U. S. 693, 10 S. Ct. 228, 230, 33 L. Ed. 502, in which it is said:

"The provision of section 4915 is that the circuit court may adjudge that the applicant 'is entitled, according to law, to receive a patent for his invention, as specified in his claim, or for any part thereof, as the facts in the case may appear;' and that, if the adjudication is in favor of the right of the applicant, it shall authorize the commissioner to issue the patent. It necessarily follows that no adjudication can be made in favor of the applicant, unless the alleged invention for which a patent is sought is a patentable invention. The litigation between the parties on this bill cannot be concluded by solely determining an issue as to which of them in fact first made a cabinet creamery. A determination of that issue alone, in favor of the applicant, carrying with it, as it does, authority to the commissioner to issue a patent to him for the claims in interference, would necessarily give the sanction of the court to the patentability of the invention involved.

"The parties to the present suit appear to have been willing to ignore the question as to patentability in the present case, and to have litigated merely the question of priority of invention, on the assumption that the invention was patentable. But neither the circuit court nor this court can overlook the

question of patentability. The bill claims a patent for what it alleges was invented by Wooster as a patentable invention; and the answer of the defendants is founded upon the view that Hill and Prentice were the first inventors of the improvements covered by the four claims in question, as patentable inventions. * * *

"We are of opinion that they are entitled to have the decree below reversed, on the ground that it was not a patentable invention to add a lower compartment to a box creamery on legs."

See, also, Walker on Patents (6th Ed.), by John L. Lotsch, page 226.

With that view of the matter, it becomes necessary to consider the sufficiency of the Sperry disclosure. It will be recalled that this question was not considered by the Examiner of Interferences, nor in the subsequent proceedings before the Patent Office, because of Perkins' failure to move to dissolve the interference.

Strictly speaking, and under the authority of Barrett v. Koppers, 22 F.(2d) 395, this court should refuse to examine the question, in the absence of a satisfactory explanation of his failure to move at the proper time. Nevertheless, I have considered the question raised, and find adversely to the plaintiffs.

The law, of course, is well settled. The description in a patent for a machine is sufficient if it discloses the means for achieving the result intended, in such a way as to enable those skilled in the art to understand it. A statement of the mechanical principles involved is not essential. Webster Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177.

It was said in Engineer Co. v. Hotel Astor (D. C.) 226 F. 779, 783, by Judge Hough: "A device need not be perfect in order to escape the charge of inoperativeness. * * * The test of operativeness is to ascertain whether the patented device does (even lamely and imperfectly) perform the acts claimed for it in the method described and (perhaps) for the reasons given."

With those considerations in mind, it will not be difficult to dispose of the attack on the validity of the Sperry claims in issue.

It is asserted as to claim 26 that there are no means disclosed to maintain the trapeze in vertical position with reference to the aircraft, while the craft is in flight. These means are the cables 38 and 57, extending from the trapeze to the frame 3.

Lines 80 to 84, page 2 of the specification of the patent, recite: "The trapeze pendulously hangs downwardly from hinge 34 as shown in fig. 2, its substantially vertical position being normally retained by the frictional resistance of the cable system."

The tension of these cables must undoubtedly be very great in order to function as they are intended to; and there is no reason why they should not be made with such tension.

Attack is made also on the insufficient disclosure in the drawing and specification of "the means for elevating the trapeze to and housing it within the sides of the aircraft," claim 27, or "within the enclosure of the cabin," claim 29. These seem to be sufficiently indicated, however, in the tension devices mounted on the frame 3. When the trapeze joint 11 is broken, with the trapeze in the vertical position shown in Fig. 2 of the patent, it can be raised under the action of the tension forces acting on the trapeze through the cables 38 and 57. The extent to which the trapeze is raised is indicated by the dotted line position in Fig. 2 of the patent.

It must not be forgotten that Patent Office drawings are not mechanical drawings nor working drawings. Remington Cash Register Co. v. National Cash Register Co. (D. C.) 6 F.(2d) 585. There seems to be nothing mechanically impossible in the suggestion made by the patentee in the raising of his trapeze.

The witness Kirkham, of long experience in the airplane art, having at one time been chief engineer for the Curtiss Airplane Corporation, was retained by Sperry to assist him to make a mathematical study and develop the general drawings of a workable apparatus. Referring to his drawings, which are in principle similar to those of the patent, he said that the means provided for raising the trapeze from the extended position to the dotted line position were the tensioned cords forming part of the recoil check mechanism. He said no winch was required. Describing the mechanism after the airplane was released and the trapeze drawn up, he said:

"First of all this recoil mechanism had this rubber band around the drums which were sufficient to take up this slack. When that came back to normal, it normally is held in a pretty near vertical position. When it swung back, the heavier cords which acted as a shock absorber, overcame the resistance of the other cord and wound it up. Therefore, when the trapeze was in a vertical position, the main shock absorber cords were in the normal position practically contracted,

whereas the other one was extended to practically the full extent.

"Now, for the purpose of folding up, one simply collapses these two struts—what happened was in this position, in the full extended position, both these cords had tension, therefore this was under compression. When you bend this forward so that it could collapse, the tension of this swing would spring it right up to position, right up against the bottom of the cabin of the framework. You will notice in the retracted position, these cords attached to the trapeze here are still much longer than they are in this position here (indicating)."

Of the shock absorber cord, the witness said: "It was supposed to be wound with considerable initial tension so that when the trapeze is within the extended position, this cord could not retract any further. Therefore, when the trapeze folded up, it folded up without any rearward movement of this cable 38. It simply swung around that point up to the dotted line position which we show."

Finally, Kirkham said that when the trapeze is raised it was substantially within the over-all dimensions of the cabin of the dirigible, depending somewhat on the actual shape of the cabin.

In view of the foregoing, the allegations as to inoperativeness and failure of disclosure are not sustained.

The bill of complaint should be dismissed.

If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith.